WILLIAM P. CHENG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cheng v. Commissioner
Docket No. 24207-82.
United States Tax Court
T.C. Memo 1986-153; 1986 Tax Ct. Memo LEXIS 453; 51 T.C.M. (CCH) 861; T.C.M. (RIA) 86153; April 17, 1986. Eugene D. Silverman and William W. Holcomb, for the petitioner. John F. O'Brien,Willard J. Frank, and Robert B. Dugan, for the respondent. CLAPP
MEMORANDUM OPINION CLAPP, Judge: In a notice of deficiency, dated July 16, 1982, respondent determined deficiencies in petitioner's Federal income tax of $8,297 for 1977 and $22,679 for 1978. This case is before the Court on respondent's motion for partial summary judgment, and petitioner's cross-motion for partial summary judgment, each filed pursuant to Rule 121, Tax Court Rules of Practice and Procedure. The issue raised in both motions is whether petitioner may deduct claimed losses for the taxable years in issue to the extent they resulted from alleged advanced minimum royalty payments. Petitioner resided in San Diego, California at *454 the time the petition was filed in this case. The pleadings, affidavits and exhibits attached thereto contain the facts used for the purpose of ruling on the motions. The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. Jacklin v. Commissioner,79 T.C. 340, 344 (1982). [1]
Imperial Finance NV is a corporation formed in Netherlands Antilles which operated in Grand Cayman in the British West Indies. In 1977 Imperial Finance acquired an option to lease the mineral and mining rights on certain land in South West Africa. For each of the years 1977 and 1978 these rights were divided into one thousand "working interests" which were sublet to investors in full or fractional units. According to the sublease agreement, each working interest entitled the investor to mine and remove diamonds in return for a minimum annual royalty payment. The *455 1977 sublease provided for a five-year term which could be automatically extended from year to year upon payment of the minimum annual royalty until all the diamonds have been mined. The 1978 sublease called for a four-year term with the same provisions for extension. The 1977 sublease agreement [2] contains the following provision with respect to the minimum annual royalty: 4. Minimum Annual Royalty. (a) Participant agrees to pay to Lessor a minimum annual royalty (the "Minimum Annual Royalty") of $150,000 per Lease Year regardless of the amount of diamonds, if any, which may actually be mined, removed or sold from the Property during such Lease Year. * * * (b) The Minimum Annual Royalties for the Lease Years ending on December 27, 1978, and thereafter are payable on or before the September 30th immediately preceding the commencement of each such Lease Year unless prior to June 30th immediately preceding the applicable September 30th of each Lease Year, the Participant notifies the Lessor that Participant does not intend to make such payment, in which event there will be a complete termination of all of Participant's rights hereunder except as hereinafter provided. Notwithstanding *456 anything herein contained to the contrary, Lessor shall not exercise its right of foreclosure hereunder unless and until it has notified Participant and any assignee by 30-day written notice of Participant's failure to comply with the provisions hereof. Such notice shall state that Participant's failure to advise Lessor within 30 days of the date of such notice of Participant's intention not to continue to make the Minimum Annual Royalty Payment and Participant's further failure to make such payment shall result in Participant's total forfeiture of all rights granted hereunder. (c) References throughout this agreement to carats shall be to carats as they are mined-raw, rough and untreated. (d) For purposes of this Agreement, the following terms shall have the following meanings: (1) The term "Minimum Yearly Carats" shall mean the first 1,200 carats which may be mined on behalf of Participant in each Lease Year. (2) The term "Deficiency" shall mean the extent to which the number of carats mined on behalf of Participant in any Lease Year is less than the Minimum Yearly Carats. (e) The Minimum Annual Royalties shall be subject to recoupment at the rate of $125 per carat on *457 the Minimum Yearly Carats which are mined by or on behalf of Participant. (f) In the event that a Participant subscribes for less than one undivided Working Interest, the term hereof shall be the same, but the Participant's right to withdraw from payment and further participation hereunder shall not commence until such time as the amount of cash paid by him as Minimum Annual Royalty Payments hereunder equals or exceeds $150,000. The provisions dealing with remedies and forfeiture state in pertinent part as follows: 11. Remedies/Forfeiture. * * * (b) Notwithstanding anything to the contrary contained herein, in the event Participant or any assignee has given notice of intent not to make payment of the Minimum Annual Royalty as provided in paragraph 4(b) hereof, then Participant shall not be liable therefor or for any future Minimum Annual Royalty, this Agreement shall terminate, and Participant will have no further rights hereunder except with respect to the cumulative Deficiency. Participant will *458 be entitled to receive the cumulative Deficiency at such time that the Contract Miner (or its successor) mines such amount of carats for Participant under the Mining Agreement. (c) Notwithstanding any other provisions of this Agreement, if Participant or any assignee fails to give the notice of intent stated in paragraph 4 (b) hereof, and fails to pay the Minimum Annual Royalty as provided in paragraphs 4 (a) and (b) hereof, then he shall suffer an absolute loss of any and all rights granted to Participant hereunder including but not limited to, the aforementioned cumulative Deficiency, and neither party shall thereafter have any claim against the other. In 1977 petitioner Cheng acquired a one-fifth fractional interest and paid $30,000 as an advance minimum royalty payment. He paid $6,000 directly and the remaining $24,000 was paid by the Bank of Nova Scotia, an independent financial institution pursuant to a nonrecourse obligation executed by petitioner. Petitioner did not elect to terminate his sublease at the end of the first year. Petitioner acquired an additional one-fifth fractional interest in 1978 and, therefore, paid $12,000 cash directly and paid the remaining $48,000 *459 with funds provided by an independent financial institution. Petitioner continued to make annual payments through 1980 at which time he terminated his interest. Each of the loans referred to above was evidenced by a promissory note and a lending agreement. The lending agreements for each year, although apparently executed by a different financial institution, were identical. They provided that the lender would, in addition to the 80 percent royalty paid in the first year, lend to the investor up to 80 percent of the royalty due in succeeding years to the extent that the diamonds recovered for the investor did not generate funds sufficient to cover the succeeding years' royalties and that the investor was not in default under the sublease. Interest was to accrue at the rate of ten percent per annum. The lending agreements provided that the principal of the loan was payable solely from the investor's share of proceeds of sales of diamonds. The promissory notes permitted certain penalties attributable to the contract miner to be applied to the interest on the notes. The notes stated that in the event any principal remained unpaid at the expiration of fifteen years from the date *460 of the note, the remaining balance would be due and payable. The notes further stated in accordance with the lending agreement that the investor assigned to the lender as collateral all of the investor's rights under the investor's agreement with Imperial Finance, N.V. (the lessor), Universal Diamond Mining, N.V. (the contract miner) and Transworld Investors, Ltd. (the diamond sales company). Except for the aforementioned collateral, the lender was to be without recourse against the investor. No diamonds were mined or sold in either 1977 or 1978. Petitioner claimed on the Schedule C attached to his 1977 income tax return a $30,170 loss of which $30,000 represented his payment of the alleged minimum annual royalty. Petitioner claimed on the Schedule C attached to his 1978 income tax return a $60,340 loss of which $60,000 represented his payment of the alleged minimum annual royalty. In the notice of deficiency, respondent disallowed all the losses claimed with respect to the diamond mining venture. For purposes of these motions, we are concerned solely with the deduction for minimum annual royalties. Rule 121(b) provides that a decision shall be rendered upon motion for summary *461 judgment if it is shown that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." It further provides that "partial summary adjudication may be made which does not dispose of all the issues in the case." Respondent contends that the alleged royalty payments are not deductible because they do not quality as a minimum royalty as defined under section 1.612-3(b)(3), Income Tax Regs. In the alternative, respondent argues that at least eighty percent of the claimed royalty payments should be disallowed because the non-cash payments made by petitioner in the form of a nonrecourse note should be disregarded as a matter of law. The nonrecourse obligation, the payment of which was completely contingent upon the happening of future speculative events, should not be treated as bona fide debt for tax purposes. Petitioner's cross-motion for partial summary judgment requests that the Court find as a matter of law that the deductions claimed for minimum royalty payments should be allowed (1) to the extent of the cash payment and (2) to the extent of any additional amounts determined at trial to constitute payment with monies borrowed from *462 third parties. The primary issue presented then is whether petitioner's royalty payments were paid pursuant to a minimum royalty provision as defined in section 1.612-3(b)(3), Income Tax Regs. If the payments were not made pursuant to a valid minimum royalty provision, then they are advanced royalties whose deductibility is limited to the extent of production and sale. It is agreed that there was no production or sale of diamonds during the years at issue. Therefore, in order for petitioner to be entitled to a royalty payment deduction, the payments must be made pursuant to a minimum royalty provision. The relevant portion of the regulations provides: a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. * * * Thus, there must be a requirement *463 that annual, uniform payments are made over a 20-year period or over the life of the lease. Respondent argues that there is only an illusory obligation to pay minimum royalties because subsequent to the initial year, the lessee need not pay the minimum royalty so long as the lessee provides timely notification of intent not to pay. In respondent's view such an arrangement is not only at odds with the definition of a minimum royalty set forth in the regulation and as interpreted by this Court in Wing v. Commissioner,81 T.C. 17 (1983), but also at odds with the purpose of a minimum royalty, i.e., economic incentive to the lessee to continuously develop and exploit the mineral lease. Petitioner argues that neither Wing nor the regulation requires that the term of the lease be definite, only that the annual payments be uniform over the life of the lease. The life of the lease should be determined according to the facts as they actually occurred. Because petitioner continued to make payments for four years, the life of the lease was four years. In Wing the agreement provided for payment by lessee of an "advanced minimum annual royalty of $60,000 ($60,000 *464 for each of the first ten years of the sublease)." The agreement further provided that the minimum royalty would be paid $10,000 in cash and a nonrecourse note of $50,000. Under the note no payment was due until ten years after execution. This Court found that there was no requirement that the payment of $6,000 per year be made for the life of the lease. The taxpayer was only obligated to pay $10,000 in cash at first and possibly $50,000 at the end of the lease term. We stated: To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must require payment at least annually. That the note may in fact be paid at some later date is not sufficient to establish the existence of such a requirement. [81 T.C. at 40-41. Emphasis in original.] It is true that the regulations do not speak to the necessary length of the lease. We agree with respondent, however, that the regulation does not contemplate a case-by-case determination as to the term of the lease based on petitioner's unfettered discretion. The lease contract states that the term is for five years with possible extensions. Petitioner *465 asks us to ignore the term of the lease as stated in the contract and instead look at the facts presented in each case to determine the life of the lease based on petitioner's own unilateral conduct. It is clear, however, from the lease that there is no requirement that payments be made after the initial year. Petitioner argues that Wing is distinguishable from the present case because here there are four annual uniform payments rather than a lump-sum payment. Also, the nonrecourse notes were not given to the lessor but rather to an independent third party lender. In Wing there was no economic incentive to develop or exploit the mineral lease because no cash, only a nonrecourse note due in 10 years, was available to pay for such activities. Here, however, petitioner argues that such an incentive existed because the loan proceeds were paid to the lessor and were available for the development of mineral production. However, petitioner ignores the fact that after the first year there was no guarantee that any more proceeds would be paid and made available. Petitioner relies on footnote 33 in Wing which states: 33. We note that if the agreement had a provision stating *466 only that royalties would be paid $6,000 per year for the life of the lease, then each year the lessee is forced to pay or else face forfeiture of the mineral interest security. In the present case, there is no such requirement, at least until the year 1987. Petitioner argues that if he exercised his right to terminate at the end of the year, he would forfeit his rights to participate in future profits of the venture. Because of this potential forfeiture, petitioner is in essentially the same position as a taxpayer who is obligated to make minimum royalty payments under a lease with a definite term. This Court in the footnote was only noting that there was no annual requirement in the royalty provision at issue there. We concluded in Wing that there must be an enforceable requirement that substantially uniform minimum royalties be paid annually. Here, petitioner's ability to withdraw from the lease at will "belies any actual requirement to make annual royalty payments." Capek v. Commissioner,86 T.C. 14, 47 (1986). Also, we note that petitioner is incorrect that the lessee forfeits his rights to share in future mining under paragraph 11(b) of the sublease. *467 The lessee is entitled to receive the cumulative deficiency. While petitioner by not paying the next year's royalty would forfeit his rights to future profits in the venture beyond the cumulative deficiency, he would receive, if petitioner's theory is adopted, a present benefit in the form of a tax deduction of $5 for every $1 of his own cash invested. The 80 percent of the royalties borrowed from the lender only had to be paid from the sales proceeds of the diamonds, if any. In sum, because there is no enforceable requirement that annual payments be made over the life of the lease, the lease does not satisfy the minimum annual royalty provision requirement. Therefore, petitioner is not entitled to deduct the royalties. Accordingly, respondent's motion for partial summary judgment is granted and petitioner's motion is denied. An appropriate order will be issued.
Footnotes
1. Respondent states that, although it is his belief that the purported transactions did not, in fact, take place as described in the documents attached as exhibits, he concedes, for the purpose of his motion only, that they did take place as described.↩
2. The 1978 sublease agreement contains substantially identical provisions except the date given in paragraph 4(b) is December 31, 1978 (sic?) instead of December 27, 1978.↩