William P. CHENG,
Petitioner–Appellant,

v.

COMMISSIONER INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

No. 87–7447.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 31, 1988.

Decided June 27, 1989.

Yaakov Vanek and Eugene D. Silverman, De Castro, West, Chodorow & Burns, Los Angeles, Cal., for petitioner-appellant.

David M. Moore, Attorney, Tax Div., Washington, D.C., for respondent-appellee.

Before WRIGHT, NORRIS and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

William P. Cheng appeals from the Tax Court's grant of partial summary judgment in favor of the Commissioner of the Internal Revenue Service (Commissioner) upholding the Commissioner's determination that Cheng's minimum royalty payments of $20,000 in 1977 and $60,000 in 1978 for unmined diamonds were not deductible under Treas.Reg. § 1.612–3(b)(3) (as amended in 1977). We conclude that we lack jurisdiction for want of an appealable final order and dismiss the appeal.

I

In 1977, Cheng entered into a five-year mining sublease with Imperial Finance, N.V. (Imperial). Under the terms of the sublease, Imperial granted Cheng the right to mine and remove diamonds from a specified parcel of land in South Africa leased by Imperial in exchange for a "minimum annual royalty" of $30,000 [1] per lease year. The minimum annual royalty was subject to recoupment at the rate of $125.00 per carat on the first 1,200 carats (minimum yearly carats) mined by or on behalf of Cheng in that year. In the event the number of carats mined in any lease year was less than the minimum yearly carats, the resulting deficiency (cumulative deficiency) could be carried forward to subsequent lease year. Cheng's $30,000 investment thus

---

1. The sublease required a minimum annual royalty of $150,000 for each working interest per

lease years.[2]

Although the term of the sublease was five years, after the first year and for each succeeding year, Cheng could terminate his obligations under the sublease simply by providing timely notice of his intent not to pay the minimum annual royalty. If Cheng gave notice of his intent not to pay the minimum annual royalty, his liability for any future minimum annual royalties terminated and he had no further rights under the agreement except with respect to any existing cumulative deficiency. If Cheng failed to pay the minimum annual royalty without notifying Imperial, Cheng forfeited all rights under the sublease agreement, including the right to any cumulative deficiency.

In order to finance the minimum royalty payments, Cheng entered into an agreement with the Bank of Nova Scotia. The Bank of Nova Scotia agreed to loan Cheng 80% of the initial minimum annual royalty, and up to 80% of the minimum annual royalty in each subsequent year. Interest was to accrue at the rate of 10% per annum on the unpaid balance. The principal amount of the note and any interest due was payable out of Cheng's share of any proceeds from the sale of diamonds mined on his behalf. Any unpaid principal was due and payable fifteen years from the date of the note. As security for the note, Cheng assigned to the Bank of Nova Scotia all his rights to any diamonds mined or proceeds from their sale. The note otherwise provided the Bank of Nova Scotia with no recourse against Cheng. In accordance with the terms of the agreement, Cheng paid $6,000 of the minimum annual royalty in cash, and executed a promissory note to the Bank of Nova Scotia for the balance of $24,000.

Cheng did not elect to terminate his sublease at the end of the first year. Instead, Cheng entered into a second sublease agreement with Imperial identical to the 1977 sublease. For the 1978 lease year, Cheng paid $60,000 to Imperial. Twenty percent, or $48,000 of the amount paid to Imperial was provided by an independent financial institution. It is unclear from the record whether the lending institution was the Bank of Nova Scotia. Cheng apparently executed a separate promissory note that was subject to the same terms and conditions as the 1977 note. Cheng continued to pay the minimum annual royalties through 1980, when he terminated his interest under the sublease agreements.[3] No diamonds were mined or sold on behalf of Cheng in either 1977 or 1978.

Cheng claimed a loss of $30,170.00 on his 1977 income tax return, and a loss of $60,340.00 on his 1978 income tax return. The additional claimed deductions of $170.00 in 1977, and $340.00 in 1978, apparently represented loan fees paid to the lending institution. The Commissioner disallowed Cheng's claimed deductions in their entirety on the ground that Cheng had not established that the losses were incurred in a trade or business. The Commissioner also disallowed Cheng's claimed deduction for his minimum annual royalty payments because they did not meet the requirements of Treas.Reg. § 1.612–3(b)(3). Treas.Reg. § 1.612–3(b)(3) permits the deduction of advanced royalties in "the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold." When, however, advance royalties are paid or accrued as a result of a "minimum royalty provision," the regulation provides that "the payor, at his option, may instead treat the advance royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued," regardless of whether minerals are mined. *Id.* The regulation defines "a minimum royalty provision" as a provision that "requires that a substantially uniform amount

---

represented his prorata share for a "one-fifth fractional working interest."

**2.** Cheng contracted with Universal Diamond Mining N.V. (Universal) to mine and remove the diamonds from the property leased from Imperial. He entered into a separate contract with

Trans World Investors, Ltd. to sell the diamonds mined by Universal.

**3.** Unlike the notes executed by Cheng in 1977 and 1978, the notes executed in 1979 and 1980 were apparently recourse notes.

of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years...." *Id.*

Cheng petitioned the Tax Court for review of the Commissioner's determinations. In his petition, Cheng challenged the Commissioner's determination that the diamond mining venture was not a trade or business, and that the minimum annual royalty payments did not meet the requirements of Treasury Reg. § 1.612–3(b)(3). He argued in the alternative that he should be permitted to deduct the total losses as a beneficiary of a trust established by Imperial or as a "theft and/or embezzlement loss."

The Commissioner moved for partial summary judgment on Cheng's claimed deductions for the minimum annual royalty payments under Section 1.612–3(b)(3). The Commissioner contended that Cheng's minimum annual royalty payments were not deductible because Cheng's obligation to make the annual payments was "illusory"; Cheng could avoid payment by providing timely notification of his intention not to pay. Alternatively, the Commissioner asserted that 80% of Cheng's claimed deductions should be disallowed because Cheng's nonrecourse notes were too contingent and speculative to be treated as bona fide indebtedness for tax purposes. Cheng opposed the Commissioner's motion and filed a cross-motion for partial summary judgment on the same issues.

The Tax Court denied Cheng's motion and granted the Commissioner's motion for partial summary judgment. The court held that the subleases did not satisfy the minimum annual royalty provision requirement under Treas.Reg. § 1.612–3(b)(3), and that Cheng was therefore not entitled to deduct any portion of his minimum annual royalty payments. Relying on *Wing v. Commissioner*, 81 T.C. 17 (1983), the Tax Court concluded that the minimum annual royalty requirement under the subleases did not constitute a minimum royalty provision as defined in Treas.Reg. § 1.612–3(b)(3) because there was no enforceable requirement that annual payments be made over the life of the lease. 51 T.C.M. (CCH) 861, 864 (1986). In the court's view, Cheng's

"ability to withdraw from the lease at will 'belies any actual requirement to make annual royalty payments.'" *Id.* at 865. (quoting *Capek v. Commissioner*, 86 T.C. 14, 47 (1986)). Concluding that no payments were deductible under Treas.Reg. 1.612–3(b)(3), the court did not reach the question whether repayment of the nonrecourse notes was contingent on the success or failure of the mining venture and thus not deductible.

Following the entry of the Tax Court's order granting the Commissioner's motion for partial summary judgment, the parties entered into a stipulation and order to permit the entry of an appealable final order. The stipulation provides in relevant part:

Petitioner wishes to appeal the Court's order granting Respondent's motion for partial summary judgment. The parties recognize that in the event that the Court's motion for partial summary judgment is reversed on appeal and the case remanded to the Tax Court the remaining issues may have to be tried before the Court. However, in order to permit the entry of a final appealable decision at this time and without in any way impairing the parties ability to litigate the remaining issues, the parties hereby stipulate that:

[A final order] ... may be entered by the Court upon the stipulation that Petitioner is not conceding the remaining undecided issues and should a decision be entered in favor of Petitioner on appeal and the case remanded to the Court, Petitioner will, on remand, be permitted to present additional evidence and arguments in support of his entitlement to deduct the losses in issue, including those not addressed in the motion for partial summary judgment.

Under the terms of the stipulation Cheng agreed to permit the Tax Court to enter a decision in the full amount of the deficiencies asserted by the Commissioner, thereby waiving his claimed deductions for the loan fees as well as his other arguments in support of his entitlement to deduct his total losses for 1977 and 1978. In exchange, the Commissioner granted Cheng

the right to resurrect the issues waived, including those not addressed in the motion for partial summary judgment, should the case be reversed by this court. Pursuant to the stipulation, the Tax Court entered a final order in the full amount of the deficiencies asserted by the Commissioner. Cheng appeals from the order entered by the Tax Court pursuant to the parties' stipulation.

## II

■ Although neither party raises the issue, we must address sua sponte whether we have jurisdiction over this appeal. *See Unioil, Inc. v. E.F. Hutton & Co.*, 809 F.2d 548, 554 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987). Courts of appeal have jurisdiction to review the decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1) (Supp. IV 1986). The finality rule contained in 28 U.S.C. § 1291 (1982) granting courts of appeals jurisdiction of appeals from all "final decisions of the district courts" therefore applies to review of decisions by the Tax Court.

The Tax Court's order granting partial summary judgment in favor of the Commissioner did not dispose of all of Cheng's claims. Cheng's claimed deduction of $510 for loan related expenses was not raised by the Commissioner in his motion nor considered by the Tax Court. Additionally, Cheng's arguments that he should be permitted to deduct his total losses as a beneficiary of a trust established by Imperial or as a "theft and/or embezzlement loss" also were not disputed in the Commissioner's motion or discussed by the Tax Court.

■ It is axiomatic that orders granting partial summary judgment, because they do not dispose of all claims, are not final appealable orders under section 1291. *See Wolf v. Banco Nacional de Mexico, S.A.*, 721 F.2d 660, 662 (9th Cir.1983), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed. 2d 778 (1985); *Chacon v. Babcock,* 640 F.2d 221, 222 (9th Cir.1981); Fed.R.Civ.P. 56(d) advisory committee's note on 1946

amendment ("[A] partial summary 'judgment' is not a final judgment, and, therefore, ... is not appealable."). Recognizing that the partial summary judgment did not constitute a final order and was not appealable, the parties entered into the stipulation recorded above. The parties acknowledge that they may not, by consent, confer jurisdiction upon this court. The parties believed at the time the order was entered, however, and now contend on appeal, that the order is final for purposes of section 1291 because the case will come to an end if the Tax Court's decision is affirmed. But as the parties concede and as is apparent from the stipulation, Cheng may resurrect the issues he waived by stipulation if this court reverses. The issue we must decide, then, is whether the Tax Court's order, considered in light of the parties' stipulation, should be construed as a final appealable order notwithstanding that there remain claims yet to be decided for the first time by the Tax Court should the Tax Court's order be reversed.

We begin our analysis with the recognition that a determination of whether an order is final is not always clear. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 170, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974) ("While the application of § 1291 in most cases is plain enough, determining the finality of a particular judicial order may pose a close question."); *In Re Kemble,* 776 F.2d 802, 805 (9th Cir.1985) ("What orders are final for purposes of [section 1291] is not always clear."). "No verbal formula yet devised can explain prior finality decisions with unerring accuracy or provide an utterly reliable guide for the future." *Eisen,* 417 U.S. at 170, 94 S.Ct. at 2149 (footnote omitted). In applying the finality requirement, however, the Supreme Court has described a final decision as a "decision by the District Court that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment,'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)); *accord Firestone Tire & Rubber Co. v. Risjord,* 449

U.S. 368, 373–74, 101 S.Ct. 669, 672–74, 66 L.Ed.2d 571 (1981), and has required that " 'a party ... raise all claims of error in a single appeal following final judgment on the merits,' " *Flanagan v. United States*, 465 U.S. 259, 263, 104 S.Ct. 1051, 1053, 79 L.Ed.2d 288 (1984) (quoting *Firestone Tire*, 449 U.S. at 374, 101 S.Ct. at 673). We interpret the former standard to mean that an order must conclusively terminate the litigation in order to be considered final; an order that *may* terminate the proceeding is insufficient. Similarly, the requirement that all claims of error be raised in a single appeal is not satisfied if there is a *possibility* that more than one appeal will be filed. Treating an order that has the potential of leading to multiple appeals as final would be inconsistent with Congress's policy disfavoring piecemeal appellate review. The Supreme Court has repeatedly recognized that " 'the policy of Congress embodied in [§ 1291] is inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation....' " *Id.* 465 U.S. at 264, 104 S.Ct. at 1054 (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 3082, 73 L.Ed. 2d 754 (1982)).

■ The Tax Court's order in this case, as a result of the parties' stipulation, does not conclusively end the litigation on the merits; review of the order will result in piecemeal review were we to reverse. Were we to entertain this appeal and reverse the Tax Court on the issue presently before us, it is not at all unlikely that the party that loses below would file an appeal on the waived issues.

Allowing Cheng separate appeals would also undermine one of the primary purposes underlying the final judgment rule— the efficient use of judicial resources. *See id.; accord Richardson Merrell Inc. v. Koller*, 472 U.S. 424, 429–30, 105 S.Ct. 2757, 2760–61, 86 L.Ed.2d 340 (1985); *Firestone Tire*, 449 U.S. at 373–74, 101 S.Ct. at

672–74. Consideration of several appeals would require us to incur "the costs of repeated refamiliarization with the case." 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure*, § 3907, at 433 (1976). Additionally, a decision on the issue in the present appeal—whether Cheng can deduct the minimum annual royalties under Treas.Reg. § 1.612–3(b)(3)—may be unnecessary if we were to reverse the Tax Court. In considering Cheng's remaining claim, the Tax Court would in all likelihood be forced to decide the validity of the Commissioner's contention that Cheng's entire claimed loss should be disallowed because "it has not been established that the loss was incurred in a trade or business or was with respect to property held for the production of income." Were the Commissioner to prevail on this argument, Cheng would be foreclosed from deducting his entire claim notwithstanding this court's prior determination that the $90,000 may be deducted under Treas.Reg. § 1.612–3(b)(3).[4] Similarly, should Cheng succeed on his two alternative arguments, resolution of the difficult issues involving section 1.612.-3(b)(3) would be unnecessary. Deciding an issue on appeal unnecessarily would not constitute an efficient use of judicial resources. *See Stringfellow v. Concerned Neighbors In Action*, 480 U.S. 370, 380, 107 S.Ct. 1177, 1184, 94 L.Ed.2d 389 (1987) (section 1291 interest in judicial efficiency extends to protection of appellate courts from consideration of issues that may become moot or irrelevant).[5]

That the litigation would be ended were we to find that we have jurisdiction and affirm the Tax Court is somewhat appealing. The probability of an additional appeal and an unnecessary decision on the issue in the present appeal were we to reverse the Tax Court, however, counsels against construing the Tax Court's order as final. To hold otherwise might also have a drastic impact on the effect of the

---

4. Of course, Cheng might prevail on one of his alternative defenses and thus still defeat the Commissioner's notice of deficiency. Were this the case, however, our decision regarding Treas. Reg. 1.612–3(b)(3) would still be mooted.

5. Indeed, "[f]inal disposition in the trial court, by way of settlement or ultimately acceptable judgment, may preclude any appeal at all." 15 C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 3907, at 432 (1976).

final judgment rule. A plaintiff who has alleged several separate claims could conceivably appeal as many times as he has claims if he is willing to stipulate to the dismissal of the claims (contingent upon the affirmance of the lower court's judgment) the court has not yet considered.

Finally, we note that Cheng could easily have avoided the finality problem by simply dismissing his remaining claim and defenses without the option to pursue them should this court reverse. A plaintiff may voluntarily dismiss the remainder of his claim(s) after a partial summary judgment has been entered against him and then appeal the partial summary judgment. *See* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3914, at 230 (Supp.1988) (a final judgment can be manufactured by dismissing all of the remaining claims); *see also Hanlin v. Mitchelson,* 794 F.2d 834, 837 (2d Cir.1986) (court of appeals permitted defendant to withdraw counterclaim during oral argument to cure jurisdictional defect of pro se appellant's appeal); *Unioil, Inc. v. E.F. Hutton & Co.,* 809 F.2d 548, 554 (9th Cir.1986) ("[A]n interlocutory order [may be treated] as a final order when that portion of the case that remained in the district court has subsequently been terminated."), *cert. denied,* —— U.S. ——, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987). Cheng elected not to pursue this course, however, but rather sought to retain his undecided claim and defenses in case of a favorable outcome on appeal. For the foregoing reasons we conclude that the Tax Court's order is not final and dismiss the appeal for lack of jurisdiction.

**APPEAL DISMISSED.**