**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROMOLAND SCHOOL DISTRICT;
CENTER FOR COMMUNITY
ACTION AND ENVIRONMENTAL
JUSTICE; COMMUNITIES FOR A BETTER
ENVIRONMENT; CALIFORNIA
UNIONS FOR RELIABLE ENERGY;
KRISTOPHER JOHNS; DONALD LEE
SELBY, JR.,

        *Plaintiffs-Appellants,*

        v.

INLAND EMPIRE ENERGY CENTER,
LLC; SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT
(SCAQMD); BARRY R.
WALLERSTEIN, D. Env. In his
official capacity,

        *Defendants-Appellees.*

No. 06-56632

D.C. No.
CV-06-02514-AG

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S. W. Lew and Andrew J. Guilford,
District Judges, Presiding

Argued and Submitted
March 3, 2008—Pasadena, California

Filed November 18, 2008

Before: J. Clifford Wallace, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Wallace

15419

## COUNSEL

Marc D. Joseph and Suma Peesapati, Adams Broadwell Joseph & Cardozo, South San Francisco, California, for the plaintiffs-appellants.

Robert A. Wyman, Michael G. Romey, and Ernest J. Hahn, Latham & Watkins, LLP, Los Angeles, California, for defendant-appellee Inland Empire Energy Center.

Bradley R. Hogin, Woodruff Spradlin & Smart, Orange, California, for defendants-appellees South Coast Air Quality Management District and Barry R. Wallerstein.

## OPINION

GOULD, Circuit Judge:

The Romoland School District and several individuals and environmental groups, (collectively, "Plaintiffs") appeal the denial of their motion for a preliminary injunction and the dismissal with prejudice of their two claims against Inland Empire Energy Center ("IEEC"), a wholly-owned subsidiary of General Electric Company. Plaintiffs brought suit against IEEC under the citizen suit provision of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7604, in connection with IEEC's plans to construct an 810-megawatt power plant approximately 1,100 feet from the Romoland Elementary School in Riverside County, California. IEEC's motion to dismiss contended, among other things, that the district court lacked jurisdiction over the suit because IEEC had been granted a permit under Title V of the CAA, 42 U.S.C. §§ 7661-7661f, and such permits may not be challenged in civil or criminal enforcement proceedings in federal district court under 42 U.S.C. § 7604.

Plaintiffs also included as a defendant in their CAA action the South Coast Air Quality Management District ("the air district" or "SCAQMD"),[1] the local air pollution control

_____

[1] Plaintiffs also brought suit against Barry R. Wallerstein, an executive officer of SCAQMD, in his official capacity. However, as Wallerstein is represented by the same counsel as the air district and has not filed any motions in his own right, the terms "air district" and "SCAQMD" will be used in this opinion to refer collectively to the defendant air district and to defendant Wallerstein.

agency that issued the relevant permit and authorized IEEC to begin construction of the power plant. After the district court denied Plaintiffs' motion for a preliminary injunction and dismissed their claims against IEEC under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs sought voluntarily to dismiss their claims against the air district under Federal Rule of Civil Procedure 41(a)(2) to gain "final judgment for purposes of an appeal." The district court granted Plaintiffs' motion, but the accompanying order did not state that the dismissal of the claims against the air district was with prejudice.

We must resolve two threshold issues of jurisdiction before we may consider the merits of Plaintiffs' claims: (1) whether the district court's dismissals of the claims in this case present us with a final decision pursuant to 28 U.S.C. § 1291; and (2) whether the Central District of California was an appropriate forum, and 42 U.S.C. § 7604 an appropriate statutory basis, for Plaintiffs' challenge such that the district court had jurisdiction over it pursuant to 28 U.S.C. § 1331. We conclude that the orders appealed from are part of a final judgment and thus that we have jurisdiction over this case, but that the district court did not. Accordingly, we affirm the district court's dismissal of the claims against IEEC with prejudice, hold that the claims against the air district should also be deemed to be dismissed with prejudice notwithstanding the voluntary dismissal order's silence on this point, and further hold that all proceedings on Plaintiffs' motion for a preliminary injunction are void because the district court was without jurisdiction to entertain that motion.

# I

## A

Congress passed the Clean Air Act in 1970 "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Towards this

end, the United States Environmental Protection Agency ("EPA") is responsible for identifying air pollutants that may endanger public health and welfare and for promulgating standards for the maximum allowable concentrations of each such pollutant in the air, known as National Ambient Air Quality Standards or NAAQS. 42 U.S.C. §§ 7408(a), 7409. The CAA further requires the EPA to divide each state into air quality control regions, *see id.* § 7407(b)-(c). SCAQMD oversees one such region in California, the South Coast Air Basin, comprising Orange County and portions of Los Angeles, Riverside, and San Bernardino Counties. *See Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1035 (9th Cir. 2007). Each air quality control region is labeled as either "attainment" or "nonattainment" for each identified pollutant depending on whether the average level of that pollutant in the air in that region is at or below (attainment) or above (nonattainment) the level mandated by the NAAQS. South Coast Air Basin is an attainment area for some air pollutants like lead but is a nonattainment area for ozone, carbon monoxide, and particulate matter smaller than ten microns in diameter, known as PM10.

Each state must also submit to EPA a State Implementation Plan or SIP establishing "enforceable emission limitations and other control measures" designed to preserve attainment of the NAAQS in attainment areas and achieve attainment in nonattainment areas. *See* 42 U.S.C. § 7410(a)(2)(A). One required element of all SIPs for states with nonattainment areas, introduced into the CAA through the 1977 amendments, is a permitting program for new or modified major stationary sources of air pollution, such as electrical generators or factory smokestacks, in those nonattainment areas. *See* 42 U.S.C. §§ 7410(a)(2)(C), 7502(c)(5). Under this "new source review" ("NSR") program, any new project or modification to an existing project that would emit more than a threshold amount of a pollutant for which that region has not attained the NAAQS must apply for a permit to construct and operate that pollution source, and such a permit may only be granted

if the project uses technology that will ensure "the lowest achievable emission rate" and obtains emission reduction credits to offset the emissions that it will produce. 42 U.S.C. § 7503(a)(1)-(2). SCAQMD implements its NSR program, now part of the California SIP, through Rule 1303,[2] which provides that the air district "shall deny the Permit to Construct for any new or modified source which results in a net emission increase in a nonattainment air contaminant" unless the applicant shows through modeling that the proposed activity "will not cause a significant increase" in pollution and that all emissions will be offset with emission reduction credits. *See* Rule 1303(b)(1)-(2).[3]

Once a local rule, like SCAQMD Rule 1303, becomes part of an EPA-approved SIP after a public notice and comment period, it becomes federally enforceable in district court through the CAA's citizen suit provision, 42 U.S.C. § 7604. This provision states that "[a]ny person may commence a civil action on his own behalf against any person . . . who is alleged . . . to be in violation of . . . an emission standard or limitation," including "any . . . standard, limitation, or schedule established under . . . any . . . State Implementation Plan

---

[2]The air district's rules may be accessed at http://yosemite.epa.gov/R9/r9sips.nsf/Agency?ReadForm&count=500&state=California&cat=South+Coast+Air+Quality+Management+District-Agency-Wide+Provisions (last visited August 14, 2008).

[3]The air district has promulgated another NSR provision, Rule 2005, which applies to the air district's Regional Clean Air Incentives Market, or RECLAIM, program, a special permitting program for large emitters of nitrogen and sulfur oxides. (The IEEC power plant that is the subject of this litigation received its permit through the RECLAIM program.) Rule 2005 contains modeling and offsets requirements that are virtually identical to those in Rule 1303. *See, e.g.*, Rule 2005(b)(1)(B) ("The [air district] shall not approve the application for a . . . permit to authorize construction or installation of a new or relocated facility unless the applicant demonstrates [through modeling] that . . . the operation of any emission source located at the . . . facility will not cause a violation or make significantly worse an existing violation of the . . . national ambient air quality standard at any receptor location in the District . . . .").

approved by the [EPA] administrator . . . ." 42 U.S.C. §§ 7604(a)(1), 7604(f)(3)-(4). "The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation . . . and to apply any appropriate civil penalties . . . ." *Id.* § 7604(a).

In 1990, Congress amended the CAA to add a nationwide system of operating permits like those mandated by other environmental laws such as the Clean Water Act. *See* S. Rep. No. 101-228, at 349 (1989) [hereinafter Senate Report]. The 1990 amendments made it "unlawful . . . to operate" many sources of air pollution, including any source located in a nonattainment region that would already have been subject to the NSR requirements of 42 U.S.C. § 7503, "except in compliance with a permit issued by a permitting authority under this title." 42 U.S.C. § 7661a(a). These operating permit provisions, commonly referred to as Title V of the CAA, also specify that "[e]ach permit issued under this title shall include enforceable emission limitations and standards, a schedule of compliance, . . . and such other conditions as are necessary to assure compliance with applicable requirements of this Act, including the requirements of the applicable [state] implementation plan." 42 U.S.C. § 7661c(a). Rather than imposing an additional set of requirements on pollution sources, this permitting scheme was intended to "incorporate the requirements of the Act (including SIP requirements) that are [already] applicable to the source." Senate Report at 350. *See also* 57 Fed. Reg. 32250, 32251 (July 21, 1992) (EPA notice of regulations implementing Title V) ("While Title V generally does not impose substantive new requirements, . . . [t]he program will . . . clarify, in a single document, which requirements apply to a source and, thus, should enhance compliance with the requirements of the Act.").

As with the SIPs under 42 U.S.C. § 7410, each state or local pollution control agency was to design a program for administering Title V permits that EPA would either approve

or disapprove after an opportunity for public comment. 42 U.S.C. § 7661a(d)(1).[4] Shortly after Title V was added to the CAA in 1990, EPA promulgated regulations setting out the minimum elements that such state programs must contain to gain EPA approval, and one of these elements concerned the available mechanisms for judicial review:

> [The state's proposed program must] (x) [p]rovide an opportunity for judicial review in State court of the final permit action by the applicant, any person who participated in the public participation process provided pursuant to § 70.7(h) of this part, and any other person who could obtain judicial review of such actions under State laws. . . . [The program must also] (xii) [p]rovide that the opportunity for judicial review described in paragraph (b)(3)(x) of this section shall be the exclusive means for obtaining judicial review of the terms and conditions of permits, and require that such petitions for judicial review must be filed no later than 90 days after the final permit action, or such shorter time as the State shall designate.

40 C.F.R. § 70.4(b)(3)(x), (xii).

Title V differs from earlier CAA provisions in that EPA exercises a greater degree of ongoing oversight, reviewing not only the states' permit programs but individual permit applications and permits as well. 42 U.S.C. § 7661d(a)(1). Moreover, EPA has veto power over Title V permits: "If any permit contains conditions that are determined by the [EPA] Administrator as not in compliance with the applicable

[4]SCAQMD's Title V permit program is codified in Rules 3000-3008 and received final approval from EPA on November 30, 2001. *See* 40 C.F.R. pt. 70, appendix A, California (dd)(2); 66 Fed. Reg. 63503 (December 7, 2001) (notice granting final approval to 34 operating permit programs in California, including that of SCAQMD).

requirements of this Act, including the requirements of an applicable [state] implementation plan, the Administrator shall . . . object to its issuance." 42 U.S.C. § 7661d(b)(1). If EPA objects to a permit, it may not be issued unless it is first revised to take the objection into account. *Id.* at §§ 7661d(b)(3), 7661d(c).

If EPA does not object within 45 days of receiving a proposed permit, "any person may petition the Administrator [to make such an objection] within 60 days after the expiration of the 45-day review period . . . based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency . . . ." *Id.* at § 7661d(b)(2). Within 60 days of receiving such a petition, EPA must either grant the petition and make the proposed objection if the petitioner successfully demonstrates "that the permit is not in compliance with the requirements of this Act," or deny the petition. *Id.* "Any denial of such petition shall be subject to judicial review under" 42 U.S.C. § 7607, a CAA provision concerning judicial review of agency actions. *Id.* That judicial review provision allows for direct review of "locally or regionally applicable" EPA actions in the court of appeals for the circuit in which the action arose, but also states that "[a]ction of the Administrator with respect to which review could have been obtained under [this section] shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 7607(b)(1)-(2).

**B**

New power plants in Riverside County must undergo overlapping certification processes before they may be built, some of which track the requirements of the federal CAA and others that are unique to California or to the air district. The California Energy Commission ("CEC") assesses the environmental and public health impacts of any proposed power plant with a generating capacity of more than 50 mega-

watts and has the sole authority to certify the construction and operation of a power plant of that size. *See* Cal. Pub. Res. Code § 25500. Before CEC can grant this certification, however, it must forward the application to the local air district, which in turn determines whether the proposed plant meets the requirements of NSR and all other applicable local, state and federal air pollution regulations. *See* Cal. Code Regs tit. 20, § 1744.5. This review process has two steps within SCAQMD: First, after its initial evaluation, the air district issues a Preliminary Determination of Compliance ("PDOC"), and this document contains any necessary conditions the applicant must meet for final approval. Second, after a public comment period, the air district issues a Final Determination of Compliance ("FDOC"). Only after the air district has issued an FDOC for a project may CEC grant final approval to that project.

In addition to its indirect role in the CEC process, SCAQMD directly administers other permitting schemes applicable to the IEEC project at issue here. First, every piece of equipment that may release air contaminants must obtain a separate Permit to Construct under District Rule 201 and, once the Permit to Construct is granted and the equipment is evaluated for its compliance with that permit, a Permit to Operate under District Rule 203. Large facilities that are projected to emit more than a certain amount of pollution and so are subject to Title V of the CAA must also obtain a "facility-wide Title V permit" in addition to the individual permits to construct and permits to operate required for each piece of equipment at the facility. Finally, large emitters of nitrogen and sulfur oxides that qualify for the RECLAIM program discussed in footnote 3 receive a RECLAIM facility permit from the air district pursuant to District Rule 2006. *See* Rule 2006(b)(3); Rule 3004(b).

IEEC first applied to CEC for "certification of a power plant in Romoland, an unincorporated area of Riverside County" on August 17, 2001. On September 16, 2001, IEEC

submitted applications to the air district for permits to construct associated with this project and on September 26 submitted its application for a Title V permit. On July 12, 2002, SCAQMD issued its PDOC for the project to CEC, and on February 28, 2003, the air district issued an FDOC. On December 17, 2003, CEC published its decision to certify the power plant, noting the Romoland School District's concerns about pollution at the nearby facility but concluding that all potential environmental impacts on the school were "either insignificant, or were mitigated to a less than significant level." The air district issued a Notice of Intent to grant IEEC's Title V permit in July of 2002 but never issued any permits to construct associated with that facility design; instead, in March of 2005, IEEC petitioned CEC to modify its project to use larger, more energy-efficient turbines that would increase the proposed plant's generating capacity from 670 to 810 megawatts. CEC deemed this proposal to modify to be a request for an amendment to IEEC's CEC authorization, and approved this amendment on June 22, 2005 after holding a public hearing on the subject, concluding that "the modifications would not create any new or unmitigated significant environmental impacts [and that the new turbines would provide] superior fuel economy and environmental performance."[5] The public was invited to raise objections to the new facility configuration at the June 22 hearing, but no one expressed opposition to the amendment through oral or written comments either before or during that hearing. Plaintiffs-Appellants were strikingly silent at that time.

Because the modifications to IEEC's proposed project required it to supply new emissions calculations and modeling analysis to the air district, IEEC canceled its pending permit applications and submitted twelve superseding applications in early 2005, including an application for a revised Title V and RECLAIM facility permit and eleven applications for permits

---

[5]Because of the nature of the proposed amendment, the air district was not required to provide CEC with a new PDOC and FDOC for the project.

to construct individual pieces of equipment. On June 2, 2005, the air district published a new Notice of Intent to Issue Permit in a Riverside newspaper and also mailed the notice to more than 750 separate addresses of individuals who had either expressed an interest in being notified of such activities or who lived within a quarter-mile radius of the proposed power plant location. *See* Rule 212(c)-(d); 3006(a).[6] This notice included a description of the project and its estimated emissions, an explanation of the procedures for public comment and for requesting a hearing on the proposed permit, and contact information for a person at the air district that members of the public could speak to about the plant. *See* Rule 212(g); 3006(b). One of the plaintiffs in this case, California Unions for Responsible Energy ("CURE"), sent the air district a letter in April of 2005 asking to be notified of all developments regarding the IEEC proposal, and so CURE was included in the mailing of the Notice of Intent and was also informed of other proposed SCAQMD actions on the project.[7] California Health and Safety Code § 42302.1 affords "any

---

[6]Pursuant to District Rule 212(d), the mailing of notice to individuals within a quarter-mile radius of the facility site, as well as parents of children attending the Romoland Elementary School, was conducted by IEEC itself, with the relevant names and addresses provided to IEEC by the air district.

[7]CURE, as well as the Romoland School District, had also been involved in the public comment proceedings before CEC prior to the FDOC issuance and project certification in 2003. Specifically, both of these plaintiffs petitioned CEC for, and were granted, formal intervenor status in IEEC's certification process, which gave them the right to submit data requests to any other party (including IEEC), participate in CEC-sponsored conferences and hearings, present and cross-examine witnesses at hearings, and submit briefs. Neither CURE nor the Romoland School District, nor any of the other plaintiffs that did not have intervenor status, actively participated in any CEC hearings or conferences, and while Romoland School District did submit comments, these concerned the school district's desire to receive funding from IEEC to facilitate relocation of Romoland Elementary School to a site farther from the proposed power plant and did not raise any concerns about the project's PM10 emission levels or offsets that became the basis of this litigation.

aggrieved person" the right to petition for a hearing on the permit before the air district's hearing board within 30 days of receiving the Notice of Intent to Issue Permit and again within 30 days after a permit is issued; however, none of the plaintiffs used this administrative remedy. EPA also received a copy of the proposed permit and stated in a July 5, 2005 e-mail that it would not object to the permit's issuance. No one petitioned EPA to reconsider its decision not to object. *See* 42 U.S.C. § 7661d(b)(1)-(2) (requiring the EPA to object to non-compliant permit provisions and establishing administrative and judicial review of citizen petitions for EPA objection to state permit applications).

Accordingly, on August 5, 2005, SCAQMD issued IEEC a document entitled "RECLAIM/Title V Facility Permit" which contained sections (F and G) describing the RECLAIM rules applicable to the facility, a section (K) listing administrative conditions associated with Title V, and two sections (D and H) enumerating "emission sources at [the] facility that have been issued a Permit to Operate or a Permit to Construct along with permit conditions for emission sources at [the] facility." The cover letter sent with the permit also assigned application numbers to various pieces of equipment and explained that those applications "associated with this Facility Permit have been approved for Permits to Construct/ Temporary Permits to Operate . . . ." This cover letter further stated that "the enclosed RECLAIM/Title V Facility Permit . . . will serve as the official permit for your facility."

## C

On February 22, 2006,[8] Plaintiffs sent both IEEC and SCAQMD a "60-day notice of intent to sue" as required by the citizen suit provision of the CAA. 42 U.S.C.

---

[8]IEEC contends that when it received this notice from Plaintiffs, it was already six months into construction and had committed $400 million to the power plant project.

§ 7604(b)(1)(A). This letter stated that, based on the terms of its air district-approved permit, the power plant was in violation of the CAA's NSR provisions in two respects: (1) the emission reduction credits IEEC had purchased to offset its emissions pursuant to Rule 1303(b)(2) were obtained from the district's Priority Reserve, a bank of credits for which IEEC was not eligible; and (2) the plant was projected to emit more than the allowable amount of fine particulate matter or PM10 in violation of Rule 1303(b)(1). Plaintiffs filed a complaint in federal district court for the Central District of California on April 21, invoking the CAA's citizen suit provision, 42 U.S.C. § 7604(a), as the basis for jurisdiction and asserting the same two alleged NSR violations as distinct claims under the CAA. In all, the complaint contained four causes of action, two against IEEC for the allegedly invalid offsets and excessive emissions levels, and two against SCAQMD for granting IEEC a permit that allowed for those two violations. The complaint sought declaratory and injunctive relief as well as civil penalties from both defendants and litigation costs.

Within a month of filing suit, Plaintiffs moved for a preliminary injunction to halt construction of the power plant until IEEC's permit was modified to comply with the applicable CAA provisions. On June 12, 2006, IEEC moved to dismiss the two causes of action against it for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). On August 14, 2006, after a brief hearing, District Judge Lew denied the motion for a preliminary injunction, concluding that "the injunction factors, that is, the likelihood of success on the merits and irreparable harm and the balance of hardships," favored the defendants. In a written order entered on August 18, the district court also granted IEEC's motion to dismiss the two causes of action against it with prejudice and stated that leave to amend would not be granted.

Although neither the oral ruling nor the written order of the district court specified that the dismissal of Plaintiffs' claims against IEEC was based on a lack of subject matter jurisdic-

tion, the order did state that the dismissal was "[based on] the reasons set forth in IEEC's motion to dismiss and the papers submitted in support thereof . . . ." That motion and supporting documentation had contended, among other things, that the district court lacked jurisdiction over Plaintiffs' claims because Plaintiffs were challenging a Title V permit and so were limited to the mechanisms for judicial review provided in that part of the CAA. When Plaintiffs' claims against IEEC were dismissed, SCAQMD had not yet filed any dispositive motions. However, the air district did submit a "notice of position" to the district court on August 11 stating that it agreed with IEEC's jurisdictional argument and would be incorporating that argument into a summary judgment motion.

Responding to these developments, Plaintiffs moved on October 10 for voluntary dismissal of their two remaining claims against the air district under Federal Rule of Civil Procedure 41(a)(2), asserting in their motion that "[i]n granting . . . IEEC's motion to dismiss Plaintiffs' Third and Fourth Causes of Action without leave to amend . . . Judge Lew made a jurisdictional decision that is determinative of Plaintiffs' entire action." Plaintiffs also pointed out that "the remaining defendants in this action have stated their intention to file a dispositive motion that asserts some of the same jurisdictional arguments IEEC made in its motion [to dismiss]" and concluded that "[b]ecause Judge Lew's ruling is now the 'law of the case' that applies equally to the remaining defendants, voluntary dismissal of the remaining claims for the purposes of gaining final judgment and allowing appeal serves judicial economy." Finally, Plaintiffs stated that the air district did not oppose the voluntary dismissal and thus that a hearing on the Rule 41 motion was not necessary.

On October 12, District Judge Guilford, to whom the Plaintiffs' remaining claims against the air district had been transferred on September 20, granted the voluntary dismissal motion. The order signed by Judge Guilford and entered on the docket read, in its entirety, as follows:

> On August 18, 2006, Judge Lew entered an order dismissing Plaintiffs' Third and Fourth Causes of Action for lack of subject matter jurisdiction. The Court hereby grants Plaintiffs' unopposed application for voluntary dismissal. IT IS SO ORDERED.

On November 7, Plaintiffs filed a Notice of Appeal ("NOA") that listed both IEEC and SCAQMD as defendants and included both parties on the service list. The NOA listed the judgment appealed from as the October 12 "Court approved voluntary dismissal" and stated that Plaintiffs were also appealing "interlocutory orders that gave rise to the judgment, including, but not limited to, order granting motion to dismiss without leave to amend and order denying motion for preliminary injunction."

In January of 2007, a telephone conversation took place between counsel for Plaintiffs and counsel for the air district to which both attorneys have stipulated in signed declarations. The contact was initiated by SCAQMD's counsel, Bradley Hogin, who raised concerns about the fact that the dismissal of Plaintiffs' claims against the air district was without prejudice; Hogin asked if Plaintiffs would accommodate the air district's concerns by dismissing their appeal, altering the dismissal in the district court to be with prejudice, and then filing a new appeal. Plaintiffs' counsel, Suma Peesapati, declined, and Hogin stated that the air district would file a motion to dismiss the appeal as not relating to a final judgment. That motion was filed on April 12, 2007, and was joined by IEEC, who had not known of the voluntary dismissal of Plaintiffs' claims against the air district before being served with the NOA. On May 31, 2007, Appellate Commissioner Peter Shaw denied the defendants' motion to dismiss the appeal, without prejudice to the issue of appellate jurisdiction being considered by the merits panel.

## II

[1] Except in limited circumstances not currently at issue, parties may only appeal from, and appellate courts only have

jurisdiction over, "final decisions of the district courts." *See* 28 U.S.C. § 1291. In this context, a "final decision" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment . . . ." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (internal quotation marks omitted). A district court order is therefore not appealable unless it disposes of all claims as to all parties or unless judgment is entered in compliance with Federal Rule of Civil Procedure 54(b). *See Chacon v. Babcock*, 640 F.2d 221 (9th Cir. 1981). Related to this "one final judgment rule" is what might be called the "single appeal rule," which requires that "a party . . . raise all claims of error in a single appeal following final judgment on the merits." *Flannigan v. United States*, 465 U.S. 259, 263 (1984) (internal quotation marks omitted). We have previously cautioned that "[t]reating an order that has the potential of leading to multiple appeals as final would be inconsistent with Congress's policy [embodied in 28 U.S.C. § 1291] disfavoring piecemeal appellate review." *Cheng v. Comm'r*, 878 F.2d 306, 310 (9th Cir. 1989). Piecemeal appellate review is not only inimical to the will of Congress but also "undermines the efficient use of judicial resources" by exposing appellate panels to "the costs of repeated familiarization with the [same] case." *See id.* (internal quotation marks omitted).

SCAQMD and IEEC both argue that the order denying Plaintiffs' motion for a preliminary injunction and dismissing their claims against IEEC with prejudice and the order granting Plaintiffs' motion for voluntary dismissal of their claims against SCAQMD, taken together, are not final within the meaning of 28 U.S.C. § 1291 and are thus not appealable. Federal Rule of Civil Procedure 41 allows plaintiffs voluntarily to dismiss some or all of their claims against some or all defendants. *Concha v. London*, 62 F.3d 1493, 1506 (9th Cir. 1995). Voluntary dismissals that are effected by court order, as was done in this case, are governed by Federal Rule of Civil Procedure 41(a)(2). Such court-ordered voluntary dismissals are deemed to be without prejudice "[u]nless the order

states otherwise . . . ." Fed. R. Civ. P. 41(a)(2). Here, the order did not state that the claims against SCAQMD were dismissed with prejudice.

For many years, the general rule in this circuit had been that voluntary dismissals without prejudice do not create appealable, final judgments. *Concha*, 62 F.3d at 1507. The rationale was that "[a] voluntary dismissal without prejudice is not adverse to the plaintiff's interests," as he or she is "free to seek adjudication of the same issue at another time in the same or another forum." *Id.* By contrast, we reasoned that allowing appeal of voluntary dismissals with prejudice "is not likely to undermine our normal appellate practice by encouraging a flow of appeals that are quasi-interlocutory in nature" because if the appellate court rejects the plaintiff's claim, "the dismissal of his action with prejudice stands" and so he "is precluded from bringing another action for the same cause . . . ." *Id.* at 1508.

**[2]** The pertinent legal landscape was altered slightly in 2002 with our decision in *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064 (9th Cir. 2002). The *James* court considered a situation in which, following the district court's grant of partial summary judgment dismissing most of a plaintiff's contract claims, the plaintiff sought voluntary dismissal of her remaining claims, relating to separate contracts with the same defendant, so that she could pursue an appeal of the partial summary judgment. 283 F.3d at 1065. The district court granted her motion to dismiss without prejudice, but we nonetheless determined that the judgment was final and appealable, holding that "when a party that has suffered an adverse partial judgment subsequently dismisses remaining claims without prejudice with the approval of the district court, and the record reveals no evidence of intent to manipulate our appellate jurisdiction, the judgment entered after the district court grants the motion to dismiss is final and appealable under 28 U.S.C. § 1291." *Id.* at 1070.

**[3]** Here, as in *James*, the record does not reflect intentional manipulation. The plaintiff in *James* explained in her motion for voluntary dismissal that "[a] federal court trial on the few remaining [contracts] would not be an efficient use of time and resources" and that "once those claims are dismissed, a final judgment can be entered." *Id.* at 1068 (first alteration in original). We described those "reasons for seeking a dismissal of . . . remaining claims" as "entirely legitimate," *id.*, and those are essentially the same reasons offered by Plaintiffs in their Rule 41 motion:

> Voluntary [d]ismissal [i]s [i]n the [i]nterest of [j]udicial [e]conomy [because] [d]ismissal [w]ould [o]bviate the [n]eed for the SCAQMD defendants' [d]uplicative [d]ispositive [m]otion . . . based on the same Title V exhaustion argument that IEEC made in its motion to dismiss. . . . Under the 'law of the case' doctrine, the SCAQMD Defendants' dispositive motion would dispose of both of Plaintiffs' remaining causes of action for lack of subject matter jurisdiction . . . thus ending the case. Recognizing the high likelihood of this outcome, Plaintiffs seek this voluntary dismissal for the purpose of gaining final judgment in this case, thereby allowing an appeal of this determinative jurisdictional issue.

As Plaintiffs clarified at oral argument, they sought dismissal of their claims against SCAQMD because they believed those claims to be resolved by the district court's rulings on Plaintiffs' claims against IEEC and their motion for preliminary injunction, and they have disclaimed all intention to revive their claims against SCAQMD independently of their claims against IEEC. Moreover, the air district, like the defendant in *James*, "had an opportunity to argue that [Plaintiffs' stated reasons for seeking voluntary dismissal] were a subterfuge, but failed to do so." 283 F.3d at 1068. SCAQMD did not oppose Plaintiffs' application for voluntary dismissal and did not raise any concerns about finality of the judgment until

January of 2007, three months after the dismissal order was entered and two months after Plaintiffs filed their Notice of Appeal.

Despite these similarities to *James*, our case is distinguishable in several important respects. First, *James* involved multiple claims against a single defendant, some of which were voluntarily dismissed and others of which (those subject to the partial summary judgment) were appealed following the voluntary dismissal. *Id.* at 1065. By contrast, here Plaintiffs seek to appeal two otherwise interlocutory orders—the order dismissing their claims against IEEC but also the order denying their motion for a preliminary injunction, a motion which had sought relief from both IEEC and SCAQMD. Specifically, Plaintiffs' counsel advised at oral argument that the preliminary injunction motion sought rescission from SCAQMD of the permit it had issued to IEEC. For this reason, Plaintiffs' Notice of Appeal listed both IEEC and the air district as defendants, and the air district submitted a brief and participated in oral argument on appeal even though all of Plaintiffs' claims against it had been dismissed. This involvement by a defendant in an appeal of issues that it never litigated before the district court goes well beyond the straightforward two-party scenario contemplated in *James*, and the legal uncertainty for such a defendant is compounded where it faces the possibility that the original claims against it may be revived, depending on the outcome of the appeal, because they were dismissed without prejudice.

Second, the *James* panel found it significant that the voluntarily dismissed claims in that case related to different contracts for different pieces of artwork than the claims being appealed, making it likely that final judgment could also have been obtained through severance of the claims by the district court under Federal Rule of Civil Procedure 54(b). *See id.* at 1068 ("There is no evidence . . . that James attempted to circumvent Rule 54(b), or that the final judgment issued by the district court undermines the Rule 54(b) procedures.").

Although a Rule 54(b) severance was never sought in this case, the chances of one being granted are more remote than they were in *James*, given that the two sets of claims here involved the same alleged CAA violations at the same power plant authorized by the same permit. The closely intertwined nature of these claims dictates that as a practical matter, any further proceedings in this action or a related future action against either of these defendants, whether in our court or the district court, would require close monitoring and likely legal involvement by all three parties to this appeal. The concerns we raised in *Cheng* about piecemeal appellate review requiring multiple panels to familiarize themselves with the same case, *see* 878 F.2d at 310, thus apply with greater force here than in *James* because of the parallels between Plaintiffs' claims against IEEC and the air district.

**[4]** The year after *James* was decided, we clarified that *James* had carved out "an exception to the general rule that 'in the absence of [a Rule 54] determination . . . any order or other form of decision, however designated, which adjudicates fewer than all the claims . . . shall not terminate the action as to any of the claims[.]' " *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 888-89 (9th Cir. 2003) (quoting Fed. R. Civ. P. 54(b)) (first, third and fourth alterations in original). We conclude that this case presents such anomalous procedural issues that attempting to fit it within or outside the exception created by *James*—by deciding whether and under what circumstances the principle established in *James* applies to cases involving multiple defendants, for example—is neither necessary nor advisable. Instead, we adopt the "pragmatic evaluation of finality" counseled by our precedents, *see id.* at 890, and conclude that for purposes of this appeal, we will treat the dismissal of Plaintiffs' claims against SCAQMD as being with prejudice. We followed this approach in *Concha v. London*, where despite the parties' stipulation under Federal Rule of Civil Procedure 41(a)(1) that the dismissal of remaining claims was without prejudice, we determined that "the label attached to the dismissal is not dispositive" and treated

the dismissal as one with prejudice for purposes of creating appellate jurisdiction because this designation was consistent with the "effect that the Conchas, and indeed all the parties, intended the dismissal to have." 62 F.3d at 1508-09.

The *Concha* decision predated *James* and thus belonged to an era when only dismissals with prejudice gave rise to appealable, final judgments. However, many of the same considerations of intent that motivated us to deem the dismissal in *Concha* with prejudice lead to the same conclusion here. Whereas the parties' stipulation in *Concha* explicitly stated that the dismissal of remaining claims was without prejudice, here the order dismissing Plaintiffs' claims against the air district says nothing about the dismissal's effect, and the assertion that it was without prejudice derives solely from the presumption in Federal Rule of Civil Procedure 41(a)(2) that "[u]nless the order states otherwise, a dismissal under this paragraph . . . is without prejudice." However, looking beyond the ambiguous text of the order to Plaintiffs' other statements suggests that their intent was to resolve their claims as quickly as possible rather than to leave open multiple avenues for continued litigation. Plaintiffs included a sentence in their proposed dismissal order, which the district court struck before adopting the order, applying the "law of the case" doctrine to their remaining claims. Because their claims against IEEC had been dismissed with prejudice, applying this doctrine to their claims against SCAQMD would have resulted in a dismissal with prejudice of those claims as well. Indeed, at oral argument Plaintiffs' counsel assured us that her clients had "no intention" of relitigating their claims against the air district but had instead sought an immediate appeal in the interest of judicial economy and because their ultimate interests—ensuring that IEEC's proposed power plant in Romoland does not emit unsafe levels of pollution in violation of the CAA—were best served by an expeditious resolution of all claims.

**[5]** Accordingly, for purposes of this appeal,[9] and consistent with the record and Plaintiffs' representation at oral argument, we determine that Plaintiffs intended to dismiss their claims against the air district with prejudice consistent with the previous dismissal with prejudice of their claims against IEEC, to which Plaintiffs believed the "law of the case" doctrine applied. In light of this unambiguous evidence of intent and the ambiguous language of the dismissal order, we will consider the October 12, 2006 dismissal of Plaintiffs' claims against the air district to be with prejudice. Presented thus with an unquestionably final judgment, we have jurisdiction to hear this appeal under 28 U.S.C. § 1291 and may proceed to consider the jurisdiction of the district court.

## III

The jurisdictional argument first raised in IEEC's motion to dismiss, and reiterated in both defendants' briefs and at oral argument, has been misconstrued by Plaintiffs throughout this appeal as a claim that they "failed to exhaust administrative remedies" or a contention that Title V of the CAA "revoked" Title I, the part of the CAA containing the NSR and other preconstruction requirements. Instead, what the defendants are asserting is that because the air district has elected to incorporate all federal, state and local regulations regarding air pollution, including the requirements of NSR where applicable, into a consolidated permitting process for all facilities subject to Title V, and because Plaintiffs are not challenging IEEC's compliance with the terms of its permit but are rather asserting that the permit itself violates District Rule 1303, the only forums in which Plaintiffs could have brought that challenge

---

[9]This determination relates only to our appellate jurisdiction by making it unnecessary for us to rely on or expand *James* to establish finality for purposes of 28 U.S.C. § 1291. Like the panel in *Concha* before us, we decline to reach the question of what effect this determination would have in the district court, given that our disposition of the remaining jurisdictional question in this case will prevent further consideration of this action by a federal district court in any event.

to IEEC's permit are those authorized by Title V of the CAA and the SCAQMD rules implementing Title V within the air district. Although Plaintiffs argue that they "did not invoke" the "additional enforcement scheme" added by Title V and thus that this title is "wholly irrelevant" to their action, the defendants suggest that when the preconstruction requirements of NSR are incorporated or "merged" into a state's Title V permitting scheme, the compliance of permits granted under such a scheme with NSR and other Title I requirements may only be challenged through Title V-related judicial review procedures, whether a plaintiff specifically "invokes" Title V or not. Put another way, the defendants are not arguing that Plaintiffs failed to take certain administrative steps such as petitioning the EPA to object to IEEC's permit and that because of this failure, their claims are not ripe for judicial review in the district court; rather Defendants are contending that the type of challenge these plaintiffs are bringing —an attack on a duly issued permit as inconsistent with NSR-related components of a SIP—can never be brought in federal district court under 42 U.S.C. § 7604 when that permit was issued pursuant to Title V. To evaluate this jurisdictional challenge, we must answer two distinct questions: (1) as a factual matter, has the air district merged its preconstruction requirements, including those for new sources of nonattainment pollutants in nonattainment areas, into a comprehensive permitting scheme under the umbrella of Title V; and (2) if so, is it a legal consequence of such an arrangement that the citizen suit provision of the CAA, 42 U.S.C. § 7604, may not be used to challenge the validity of such a consolidated permit under applicable SIP requirements?

### A

**[6]** In drafting Title V, Congress intended to impose the requirement to obtain an operating permit on a wide range of pollution sources, including those sources that were already required to gain a permit before beginning construction pursuant to 42 U.S.C. § 7503, the CAA's NSR provision for new

or modified emission sources in nonattainment areas. This intended scope of the Title V program is made explicit in 42 U.S.C. § 7661a(a), which requires "any . . . source required to have a permit under Part . . . D of Title I," the NSR program, "to operate . . . in compliance with a permit issued by a permitting authority under this title." The substantive requirements of an operating permit under Title V also encompass the requirements imposed by NSR and other Title I programs, for Congress specified that "[e]ach permit issued under this title shall include enforceable emission limitations and standards . . . and such other conditions as are necessary to assure compliance with applicable requirements of this Act, including the requirements of the applicable [state] implementation plan," which, within the air district, include the NSR requirements of District Rule 1303. *See* 42 U.S.C. § 7661c(a). What sets the preconstruction requirements of NSR apart from Title V, by definition, is their timing, and "[n]othing in [Title V] shall be construed to alter the applicable requirements of this Act that a permit be obtained *before* construction or modification." 42 U.S.C. § 7661a(a) (emphasis added).

[7] To reconcile Title V's requirements for a permit during operation with Title I, Part D's requirement that a permit be obtained before construction or modification, Congress provided that state permitting programs under Title V "shall establish reasonable procedures to prioritize . . . approval or disapproval [of permit applications] in the case of applications for construction or modification under the applicable requirements of this Act." 42 U.S.C. § 7661b(c). *See also 40 C.F.R. § 70.7(a)(3)* (similar provision in EPA regulations setting out minimum standard for state Title V permitting programs). These regulations give other indications that for purposes of program administration, Title V permitting requirements may overlap with aspects of NSR and other pre-existing programs. For example, one regulatory provision establishes a deadline by which "sources required to . . . have a permit under the preconstruction review program approved into the applicable [state] implementation plan under part . . . D of the Act shall

file a complete application to obtain the [Title V] permit," except "[w]here an existing [Title V] permit would prohibit such construction or change in operation, [in which case] the source must obtain a permit revision before commencing operation." 40 C.F.R. § 70.5(a)(1)(ii). Another provision defines the term "administrative permit amendment" to include, among other things, "a permit revision that . . . [i]ncorporates into the [Title V] permit the requirements from preconstruction review permits authorized under an EPA-approved program" such as a SIP. 40 C.F.R. § 70.7(d)(1)(v).

**[8]** Yet by far the strongest evidence of federal intent to consolidate preconstruction and Title V permitting requirements comes from the Federal Register notice in which EPA announced the final adoption of its implementing regulations for Title V. In a section in that notice entitled "Permit/SIP Relationship," the agency explained:

> The SIP remains the basis for demonstrating and ensuring attainment and maintenance of the national ambient air quality standards (NAAQS). The permit program collects and implements the requirements contained in the SIP as applicable to the particular permittee. Since permits must incorporate emission limitations and other requirements of the SIP, all SIP provisions applicable to a particular source will be defined and collected into a single document.

57 Fed. Reg. at 32258. Another section under the heading "New Source Review/Title V Relationship" is instructive. It states:

> Under today's final rule State and local permitting authorities have the option, but not a mandate, to integrate requirements determined during precon-struction review with those required under title V. Such integration would be consistent with the previ-ously stated implementation goals of combining pro-

grams and building on existing State programs which typically have already accomplished such integration at the State level. As discussed above, if NSR is integrated with the procedural and compliance-related requirements contained in [40 C.F.R.] §§ 70.6, 70.7, and 70.8 (including opportunity for EPA and affected State review), an existing title V permit can be administratively revised to reflect the results of the integrated NSR process.

*Id.* at 32259.

**[9]** Analysis of the air district's permitting rules leaves little doubt that it has taken advantage of this "option . . . to integrate . . . preconstruction review with . . . Title V" requirements. One district rule, Rule 3003(h), creates some confusion of terminology when it states that "[t]he submittal of a complete Title V permit application . . . shall not relieve any person of the requirements for a pre-construction permit under Title I of the federal Clean Air Act, District Regulation XIII — New Source Review, or District Rule 2005 — New Source Review for RECLAIM." Despite the use of the term "pre-construction permit" in this rule, the cited district NSR provisions nowhere refer to a "pre-construction permit" but speak instead of "permits to construct," which are not to be granted unless the permit applicant complies with emission limitation and offset requirements. *See, e.g.*, District Rule 1303(a)(1), 1303(b). In turn, the rules that make up District Regulation II governing permits to construct contain repeated references to Title V of the CAA, such as the statement in a list of deadlines for approval or denial of construction permits that "permit revisions for Title V facilities shall follow the timetables for permit action" set forth in Regulation XXX, which contains rules implementing the district's Title V program. Rule 210(d)(3). Other cross-references to Regulation XXX occur in Rule 204 regarding written conditions of construction permits and in Rule 212, which contains the require-

ments for public notice and comment regarding permits to construct. *See* Rule 212(c)(1), 212(c)(3).

Despite its emphasis on operating permits, Title V is similarly replete with references to both NSR and permits to construct. In a parallel to the federal regulations discussed above, District Rule 3000(b)(1)(D) defines the term "administrative permit revision" to include "any Title V permit revision to . . . issue a final permit to operate for any equipment previously issued a Title V permit to construct . . . ." The Federal Register notice in which EPA granted interim approval to SCAQMD's Title V program explains the significance of this provision:

> Enhanced New Source Review. South Coast's title V permit program provides for enhanced preconstruction review, an optional process that allows sources to satisfy both new source review and title V permit modification requirements at the same time. Any modification processed pursuant to South Coast's enhanced preconstruction review procedures may be incorporated into the title V permit as an administrative permit amendment. These enhanced procedures obviate the need to undergo two applications, public notice, and permit issuance/revision processes for the same change. (See [Rule] 3000(b)(1)(D).)

61 Fed. Reg. 45530, 45532 (August 29, 1996). Another district rule is explicit about the degree to which the air district has merged its Title V permitting scheme with the source-specific permits to construct discussed in Rule 1303: "A written authorization to construct, issued as part of a Title V facility permit, shall be deemed a permit to construct for the purposes of all other District rules and regulations." Rule 3007(a)(2).

**[10]** The very permitting process at issue in this case demonstrates the extent of the integration. Although IEEC did

apply for a separate Permit to Construct for each piece of emitting equipment at its facility as well as applying for a Title V and RECLAIM facility permit, only one permit was issued to IEEC by SCAQMD: a "RECLAIM/Title V Facility Permit" which included a list of "emission sources at your facility that have been issued a Permit to Operate or a Permit to Construct . . . ." Not only were all of IEEC's applicable permits contained in a single document, but that permit was also subjected to a single public review and comment process combining the notice and comment requirements of Rule 212 concerning permits to construct and Rule 3006 regarding Title V permits. Moreover, the RECLAIM/Title V Facility Permit, including sections D and H with their lists of pieces of equipment granted Permits to Construct, was submitted to EPA for its review pursuant to Rule 3003(j). We therefore conclude that while all substantive requirements of preconstruction review remain in place in the air district, as a procedural matter the district's various permit application processes for potential emitters subject to Title V have been consolidated into a single comprehensive system, under the auspices of Title V, and IEEC's RECLAIM/Title V Facility Permit for its proposed Romoland power plant was issued pursuant to this consolidated system.

**B**

[11] Title V permits are by no means wholly insulated from the CAA's citizen suit provision. To the contrary, when the CAA was amended in 1990 to add Title V, the citizen suit provision was also amended to add to the definition of "emission standard or limitation," an alleged violation of which authorizes any person to bring an enforcement action, "any other standard, limitation, or schedule established under any permit issued pursuant to title V, . . . any permit term or condition, and any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4). In other words, if IEEC had violated a term or condition of the permit the air district issued to it, or if it had sought to begin building and

operating the power plant in Romoland without obtaining a permit under SCAQMD's merged Title V/construction permit system, either of those alleged violations would have been grounds for a citizen suit in district court under 42 U.S.C. § 7604. However, Plaintiffs' challenge fits into neither of these categories. Instead, Plaintiffs are charging that IEEC is complying with the terms of its permit but that those terms are themselves a violation of the CAA, specifically, the federally enforceable SIP provisions regarding NSR found in District Rule 1303. Because these challenged terms are part of a permit issued under Title V, we must consider Title V's administrative and judicial review provisions for challenging a permit. Those provisions require persons objecting to the issuance of a Title V permit to "petition the Administrator," and provide for judicial review regarding such petitions in the courts of appeal under 42 U.S.C. § 7607, not through citizen suits in the district courts via § 7604. 42 U.S.C. § 7661d(b)(2). The text of § 7607, which allows for direct review of regionally applicable EPA action in the geographically appropriate circuit court of appeals, also makes clear that this form of judicial review is exclusive, stating that "[a]ction of the Administrator with respect to which review *could have been obtained* under [this section] shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 7607(b)(1)-(2) (emphasis added).

**[12]** This "use it or lose it" provision of 42 U.S.C. § 7607(b)(2) does not bar enforcement proceedings only where an individual has taken advantage of the opportunity to petition the EPA Administrator and then appeals the denial of such a petition to the applicable appellate court; instead, judicial review through civil or criminal enforcement proceedings is unavailable whenever an individual "could have . . . obtained" such review. Thus, by creating in 42 U.S.C. § 7661d(b)(2) an avenue of judicial review that passes through 42 U.S.C. § 7607, Congress effectively foreclosed the alternative avenue of citizen suit enforcement through 42 U.S.C. § 7604.

Our interpretation of § 7607 as it relates to § 7661d is strengthened by the implications of Plaintiffs' proposed alternative. If Plaintiffs were able to bring this action in federal district court under the citizen suit provision and that action was appealed to our court, and if the same plaintiffs or another party who had petitioned EPA pursuant to 42 U.S.C. § 7661d(b)(2) and whose petition was denied also appealed that denial to our court, then two different panels of this court could be simultaneously confronted with similar if not identical challenges to the same permit, perhaps even brought by the same party. Such a system would be entirely unworkable and underscores why Plaintiffs are incorrect when they contend that 42 U.S.C. § 7661d created "an additional" and not a superseding enforcement scheme for challenges to the validity under the CAA of Title V permits.

The two cases cited by Plaintiffs to support their argument that allegedly invalid permits may be challenged directly through the CAA citizen suit provision, *Grand Canyon Trust v. Tucson Electric Power Co.* and *Communities for a Better Environment v. Cenco Refining Co.*, are inapposite. *Grand Canyon Trust* involved a challenge under 42 U.S.C. § 7604 to a permit that the plaintiffs contended had lapsed when the defendant did not begin construction by a certain date, in violation of a federal regulation that provided for the "automatic cancellation of already-issued construction permits" if construction did not commence by the deadline. 391 F.3d 979, 984-85 (9th Cir. 2004). This regulation thus imposed an implicit condition on the defendant's permit with which the *Grand Canyon* plaintiffs alleged the defendants in that case did not comply; by contrast, here Plaintiffs acknowledge that IEEC is compliant with all applicable terms of its permit but argue that those terms violate the CAA.

In *Cenco*, one of the plaintiffs in this action, Communities for a Better Environment ("CBE"), challenged, under the citizen suit provision, SCAQMD's decision to transfer a previously expired Permit to Operate an oil refinery to a new

permittee who proposed to modernize the formerly non-operational refinery. 180 F. Supp. 2d 1062, 1069-70, 1072 (C.D. Cal. 2001). CBE alleged various SIP violations including the failure to apply NSR requirements before allowing construction and the reactivation and transfer of the previously expired permit, which CBE contended was a violation of District Rule 209 that operating permits are nontransferable. *Id.* at 1072. The permitting decisions challenged in *Cenco* did not involve Title V, and when the defendant raised the issue of 42 U.S.C. § 7661d supplanting 42 U.S.C. § 7604 as a mechanism for judicial review, the *Cenco* court responded:

> [J]ust because a federal administrative remedy is available for objecting to the issuance of a subchapter V permit does not mean that a legal remedy under § 7604 is unavailable for a defendant's failure to comply with [non-Title V-related] SIP permitting requirements. Although Cenco may be required to eventually acquire subchapter V permits, the mere fact that plaintiffs could challenge such permits under § 7661d at that time does not preclude plaintiffs from attacking other permits now under the broad language of subsection (f)(4) [of § 7604]; indeed, the Clean Air Act nowhere states that plaintiffs must wait for the issuance of subchapter V permits before they can sue on existing violations of the SIP.

*Id.* at 1081 n.6.

**[13]** This language in *Cenco*, coming from a case involving the same air district and many of the same district rules at issue here, aptly illustrates that there are limits to our holding today. We do not opine upon the general contours or scope of the citizen suit provision of 42 U.S.C. 7604. We hold only that where a state or local air pollution control district has integrated the preconstruction requirements of Title I with the

permitting requirements of Title V and a permit is issued under that integrated system, a claim that the terms of that permit are inconsistent with other requirements of the Clean Air Act may only be brought in accordance with the judicial review procedures authorized by Title V of that Act, 42 U.S.C. § 7661-7661f, and may not be brought in federal district court under the Act's citizen suit provision, 42 U.S.C. § 7604. Because Plaintiffs' action was brought in an inappropriate forum under an inapplicable CAA provision in an untimely avenue of protest, the district court was without jurisdiction to hear it.

## IV

For the foregoing reasons, we conclude that we have jurisdiction over this appeal, and we affirm the district court's dismissal with prejudice of Plaintiffs' claims against IEEC. We grant IEEC's request for judicial notice of materials relevant to the dispositive jurisdictional question in this case. Because of our conclusion on that jurisdictional question, we decline to reach the merits of Plaintiffs' claims against IEEC or their motion for a preliminary injunction. We further hold that the district court should not entertain any further proceedings in this case or in a future action seeking to revive Plaintiffs' claims against the air district pursuant to the October 12, 2006 dismissal of those claims without prejudice, because that court lacks subject matter jurisdiction over such claims under 28 U.S.C. § 1331.

**AFFIRMED**.

WALLACE, Circuit Judge, concurring in the result:

I agree that this appeal should be dismissed, but for a different reason. Our precedents dictate that the plaintiffs' voluntary dismissal pursuant to Federal Rule of Civil Procedure

41(a)(2) cannot constitute an appealable final judgment because the dismissal was without prejudice. The majority, however, holds that the dismissal order can in fact constitute a final judgment for purposes of appeal under a "pragmatic evaluation of finality." Although this court has sanctioned a pragmatic approach to determining finality in certain limited circumstances, the majority's ruling impermissibly expands this doctrine beyond its narrow confines. In so doing, the majority adds uncertainty to the final judgment rule of appellate jurisdiction, and undermines important values of judicial economy. In my view, the better course is to follow our clearly established rules of federal jurisdiction, and dismiss this appeal for lack of appellate jurisdiction. Accordingly, I would not reach the issue of the district court's subject matter jurisdiction as discussed in Part III of the majority opinion.

## I.

Except in limited circumstances not relevant here, the courts of appeals have jurisdiction to review only "final decisions of the district courts." 28 U.S.C. § 1291 (2008). A "final decision" under section 1291 is "a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (internal quotation marks, citation and footnote omitted). The final judgment rule is essential to the proper functioning of the federal courts, as it promotes judicial efficiency, prevents multiplicity of litigation, and minimizes delay "by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).

In *Concha v. London*, we held that a plaintiff's "voluntary dismissal *without prejudice* is ordinarily *not* a final judgment from which the plaintiff may appeal." 62 F.3d 1493, 1507 (9th Cir. 1995) (emphasis in original), *citing Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1342, *corrected*, 773 F.2d 1049

(9th Cir. 1985). We reasoned that, "[t]he policy against piece-meal appellate litigation is [ ] at its height in such cases" where a party appeals a voluntary dismissal without prejudice because if that party loses on appeal, he "is in no way precluded from proceeding with the litigation following the adverse decision." *Id.* at 1508 n.8.

Here, the district court approved the plaintiffs' unopposed Rule 41(a)(2) motion for voluntary dismissal of their claims against the air district. The parties agree that because this order did not specify whether the dismissal was with or without prejudice, the dismissal is deemed to be without prejudice pursuant to Rule 41(a)(2). Therefore, under *Concha*, the plaintiffs' voluntary dismissal cannot constitute a final judgment for purposes of exercising appellate jurisdiction.

The plaintiffs argue that the voluntary dismissal nonetheless falls within the narrow exception to *Concha* articulated in *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064 (9th Cir. 2002). In that case, we permitted the plaintiff to appeal an adverse partial summary judgment order after she obtained a voluntary dismissal without prejudice of her remaining claims. *Id.* at 1068-70. We held that the voluntary dismissal without prejudice created sufficient finality for the purposes of appeal because it was made "with the approval of the district court, and the record reveals no evidence of intent to manipulate our appellate jurisdiction." *Id.* at 1070.

The *James* exception is not applicable here. As the majority correctly concludes, our case "is distinguishable [from *James*] in several important respects," including the fact that the plaintiffs seek to appeal issues never litigated before the district court, and the fact that there is a greater threat of piece-meal appellate review in this case given the "closely intertwined nature" of the claims dismissed with prejudice and those dismissed without prejudice. (Maj. Op. 15441-43.)

In addition, contrary to the majority's conclusion, the record reveals at least *some* evidence that the plaintiffs' vol-

untary dismissal without prejudice was done with an intent to manipulate our appellate jurisdiction. In particular, when counsel for the air district notified plaintiffs' counsel about its concerns that the "without prejudice" dismissal could render the decision non-final, plaintiffs' counsel adamantly refused to make the dismissal "with prejudice." Although this is not direct evidence of an intent to manipulate the appellate process, the *James* exception does not require a lack of substantial evidence or even significant evidence. So long as there is *any* evidence of an intent to manipulate, the exception does not apply. *James*, 283 F.3d at 1068-69 (finding "no evidence" that the plaintiff deliberately attempted to manipulate the court's appellate jurisdiction).

The default jurisdictional rule in *Concha* therefore applies to this case. Under this well-established precedent, voluntary dismissals without prejudice, like the dismissal at issue here, are not appealable final judgments, and this court lacks jurisdiction to review such judgments on appeal.

## II.

The majority acknowledges that *Concha* precludes voluntary dismissals without prejudice from being appealable final judgments. (Majority Op. 15439.) The majority also concedes that the *James* exception does not apply to the facts of this case. (Majority Op. 15442.) Nonetheless, the majority holds that appellate jurisdiction exists here because the plaintiffs' dismissal without prejudice can be construed as being one with prejudice under a "pragmatic evaluation of finality." (Maj. Op. 15442.) Unfortunately, this ruling cannot be squared with our precedent.

In construing the plaintiffs' dismissal as one with prejudice, the majority principally relies on the fact-specific inquiry undertaken in *Concha*. (Maj. Op. 15443-45.) In that case, although we held that voluntary dismissals without prejudice ordinarily do not constitute appealable final judgments, we

ultimately concluded that "[i]n this unusual case," the plaintiffs' voluntary dismissal without prejudice would be treated as one with prejudice for the purposes of appeal. *Concha*, 62 F.3d at 1508-09. We justified this decision on the grounds that there was "no question" that the plaintiffs "intended" their dismissal to be with prejudice, and further that the plaintiffs had "absolutely nothing to gain by filing a voluntary dismissal without prejudice." *Id.* at 1508.

This court's determination of finality in *Concha* represents a fact-specific exception to the general rule that voluntary dismissals without prejudice do not constitute final judgments for the purposes of appeal. As we have held, any exceptions to our established bright-line jurisdictional rules should be construed narrowly. *Cf. Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 888-89 (9th Cir. 2003) (holding that the *James* exception must be narrowly construed because "[a]ny other interpretation . . . would undermine [Federal Rule of Civil Procedure] 54(b) and add uncertainty to the final judgment rule"). Thus, in accordance with the specific facts addressed in *Concha*, I conclude that a court may construe a party's voluntary dismissal without prejudice to be one with prejudice only where (1) there is "no question" that the party "intended" the dismissal to be with prejudice, and (2) that party has "absolutely nothing to gain" from filing a voluntary dismissal without prejudice. *Concha*, 62 F.3d at 1508-09.

The plaintiffs in this case cannot make these required showings. First, as described above, the record demonstrates that the plaintiffs in fact had no intention of entering a dismissal with prejudice. When asked by opposing counsel to change their without-prejudice dismissal to one with prejudice, plaintiffs' counsel flatly refused.

Second, it is not at all clear that the plaintiffs had "absolutely nothing to gain" from filing a without-prejudice dismissal. In fact, the logical inference from their refusal to enter such a dismissal is that they perceived some advantage to

obtaining a dismissal without prejudice. Moreover, although the plaintiffs argue that an adverse decision on this appeal would preclude their dismissed claims against the air district, nothing would prevent them from refiling their air district claims and seeking a different result. The majority cites the plaintiffs' representations at oral argument that they do not seek to relitigate these claims as evidence that there is little possibility of such piecemeal litigation. (Maj. Op. 15444.) However, the whole point of having bright-line jurisdictional rules is to avoid the expense and effort of appeal in the first place. We cannot have a rule where parties are unable to determine appellate jurisdiction based on a facial examination of the record, but must instead go through the trouble of writing briefs and preparing for oral argument to guard against the possibility of a last-minute determination of jurisdiction. *Cheng v. Comm'r Internal Revenue Serv.*, 878 F.2d 306, 310 (9th Cir. 1989) ("[O]ne of the primary purposes underlying the final judgment rule [is] the efficient use of judicial resources").

For these reasons, I would not follow the majority's approach in construing the plaintiffs' voluntary dismissal to be one with prejudice. To expand the exception recognized in *Concha* beyond the specific facts of that case, as the majority does here, risks the adoption of an all-too flexible test for federal jurisdiction, one that would mimic former Justice Potter Stewart's definition of pornography: I know it when I see it. This approach is diametrically opposed to our federal jurisprudence, which requires finality to be clear and identifiable on the record. 15A Wright & Miller, *Federal Practice and Procedure* § 3913, at 462 (1992) ("Although well-established rules of appealability might at times cause an action to be determined unjustly, slowly, and expensively, they have nonetheless the great virtue of forestalling the delay, harassment, expense, and duplication that could result from multiple or ill-timed appeals").

Moreover, the plaintiffs had multiple avenues through which they could have appealed the non-final orders entered

by the district court. Most obviously, they could have simply specified that their dismissal was with prejudice, thereby adhering to this court's established rules of federal jurisdiction. Or, if a dismissal with prejudice was unpalatable, they could have moved for a Rule 54(b) severance, which permits a party to appeal otherwise non-final orders after the district court has made the required determination that there is no just reason for delay. Fed. R. Civ. P. 54(b) (2008).

I suggest we take an unfortunate and counter-productive turn when we fail to accept the dismissal with prejudice as necessary for appellate jurisdiction. We do not need to remind good lawyers to meet this standard, and we do not improve the appellate process by crafting rules to make up for those who are incompetent. Federal appellate jurisdiction is based on statutory requirements; and it is, in my view, misguided for us to stray from specific, easily discoverable requirements (dismissal with prejudice) to those so indefinite that guesswork is required (dismissal without prejudice — but I did not mean it).

Therefore, I concur in the result of the majority, but for the reason that our court's jurisdiction has not been demonstrated.